# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

**vs.**                                          **Case No. 8:14-CR-463-T-30-AEP**

**WASHINGTON RAFAEL CAMPOS TENORIO**

_____/

## SENTENCING MEMORANDUM

### I.      Legal Framework for Sentencing Analysis

It is now well established that sentencing requires a two-step process.  First, the district court must correctly calculate the sentencing guideline range. Second, the district court must consider the factors outlined in 18 U.S.C. §3553(a) to determine a reasonable sentence as to each defendant in each case.

In United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005), the Eleventh Circuit enumerated the ten factors used to determine a reasonable sentence: (1) the nature and circumstances of the offense and the defendant's personal history and characteristics; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide a just punishment; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with appropriate educational training, vocational training, or medical care; (6) types of sentences available; (7) the correctly-calculated sentence range under the Sentencing Guidelines; (8) pertinent policy statements of the U.S. Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.

## II.    Analysis of 18 U.S.C. § 3553(a) Factors

### A. History and Characteristics of the Defendant

Washington Rafael Campos Tenorio is a 43-year-old citizen of Ecuador.[1]  He was raised in the village of San Martin - which consisted of 8 homes situated by the banks of a river.[2]  The village was located approximately two days walk from Ecuador's largest city, Guayaquil.[3]

One of seven children,[4] Mr. Campos Tenorio began to work as a farm hand when he was just 8 years old.[5]  He cleared fields and helped his father grow tomatoes, onions, and rice.[6]  Some of the crops he and his family ate and the rest they sold at a local market.[7]  At age 11, Mr. Campos Tenorio quit school in order to work full time with his father.[8]  Consequently, Mr. Campos Tenorio has just three years of formal education.[9]

The home in which Mr. Campos Tenorio was raised was humble to say the least.  It had a wood frame; its walls were made up of sugar cane reeds and bamboo.[10]  There was neither bathroom nor latrine so the family was forced to use a field in order to relieve themselves.[11]  For drinking water the children hauled water to the home from the nearby

---

[1] PSR, page 3
[2] June 19, 2015 Interview of Washington Rafael Campos Tenorio
[3] Central Intelligence Agency World Fact Book; website:
https://www.cia.gov/library/publications/the-world-factbook/geos/ec.html
[4] PSR, page 7
[5] June 19, 2015 Interview of Washington Rafael Campos Tenorio
[6] Id.
[7] Id.
[8] Id.
[9] PSR, page 8
[10] June 19, 2015 Interview of Washington Rafael Campos Tenorio
[11] Id.

river.[12]  The home had no electricity so the family used kerosene lamps to light it.[13]  There were two bedrooms for the nine persons that lived there.[14]  The parents slept in one bedroom and the seven children slept in the other bedroom – 4 boys in one "bed" and three girls in the second "bed."[15]   The "beds" were not beds as we think of them in the United States; they did not have a mattress but rather a wicker mat on which to lie.[16]

When Mr. Campos Tenorio reached the age of 18 he entered the Ecuadorian Military.[17]  He served near the border between Ecuador and Peru in a variety of assignments.[18]  Subsequent to his military service, he relocated to the Ecuadorian costal province of Esmeraldas.[19]

Mr. Campos Tenorio is Afro-Ecuadorian.[20]   Afro-Ecuadorians are an ethnic group in Ecuador who are descendants of black African slaves brought by the Spanish during their colonialization of Ecuador.[21]  Approximately 70% of the population of Esmeraldas is Afro-Ecuadorian.[22]  This concentration has helped Afro-Ecuadorians retain their cultural traditions, but it has also greatly contributed to their being politically, socially and economically marginalized by Ecuadorian society as a whole.[23] The province of Esmeraldas receives little government funding for public works, education and

---

[12] Id.
[13] Id.
[14] Id.
[15] Id.
[16] Id.
[17] Id.
[18] Id.
[19] Id.
[20] PSR, page 3
[21] World Directory of Minority and Indigenous People, *Afro-Ecuadorians*, website: http://www.minorityrights.org/4135/ecuador/afroecuadorians.html
[22] Ecuador.com; *Ecuador: Afro-Ecuadorians and the Culture of Esmeraldas;* website: http://www.ecuador.com/blog/ecuador-afro-ecuadorians-and-the-culture-of-esmeraldas
[23] Id.

commercial investment.[24]

In Esmeraldas, Mr. Campos Tenorio found work fishing for marlin and tuna.[25] He has worked in that capacity for approximately 19 years. Normally, Mr. Tenorio and two other fishermen first catch squid to use as bait.[26] They then travel out approximately 200 miles into the sea in an uncovered 9-meter launch.[27] They are at sea up to six days and they work, eat, and sleep at the mercy of the elements.[28] Once at the fishing area, they spread out a line tied to buoys that floats on the surface of the ocean.[29] That floating line has approximately 200 lines with hooks that drop down to the depths of the sea.[30] When a tuna or a marlin takes the bait, a buoy rises from the sea to alert the fisherman.[31] Mr. Campos Tenorio and the other two fishermen then pull the deep-sea line with their hands in order to bring the fish to the boat – a process that can take hours.[32] Tuna and marlin are extremely strong and the work is difficult and dangerous.[33] If the crew is able to catch one marlin or tuna, they can cover their expenses for the trip.[34] If they can catch two or more fish, they will make a profit.[35] Mr. Campos Tenorio's normally makes between $70.00 and $100.00 dollars per month.[36]

---

[24] Id.
[25] June 19, 2015 Interview of Washington Rafael Campos Tenorio
[26] Id.
[27] Id.
[28] Id.
[29] Id.
[30] Id.
[31] Id.
[32] Id.
[33] Id.
[34] Id.
[35] Id.
[36] PSR, page 8

Mr. Campos Tenorio is in a common law relationship with Ms. Ruby Valencia.[37] Ms. Valencia works washing linens at a hotel in Esmeralda, Ecuador.[38] The couple has been together for approximately 21 years and they have three children – ages 18, 17, and 6.[39] Mr. Campos Tenorio enjoys a loving relationship with his common law wife and children.[40]

### B. The Correctly-Calculated Sentence Range under the Sentencing Guidelines

#### 1. The Presentence Report Calculation

The PSR calculates Mr. Campos Tenorio's advisory guideline range to be an offense level 33, Criminal History I.[41] This Guideline range carries a recommended sentence of 135 to 168 months imprisonment.[42] Counts one carries a minimum mandatory of ten years imprisonment with a maximum of life imprisonment.[43]

#### 2. Minor Role Reduction

Mr. Campos Tenorio should receive a two level reduction for minor role pursuant to U.S.S.G. §3B1.2 (b). *See* United States v. Rodriguez, 342 F.3d 296, 300 (3d Cir. 2003) (holding that drug couriers are often small players in the overall drug importation scheme").

In United States v. Rodriguez De Varon, 175 F.3d 930 (11th Cir. 1999), the Eleventh Circuit established a two-part test for determining whether a defendant qualifies for a minor role reduction. Id. at 934. The Court held that the district court must measure the defendant's role against her relevant conduct, that is, the conduct for which she has been

---

[37] PSR, page 7
[38] Id.
[39] Id.
[40] June 19, 2015 Interview of Washington Rafael Campos Tenorio
[41] PSR, page 6
[42] Id.
[43] 46 U.S.C. §§70503(a), and 70506(a) and (b); and 21 U.S.C. §960(b)(1)(B)(ii).

held accountable under U.S.S.G. § 1Bl.3.  Id. at 940-941. The Eleventh Circuit further stated the second part of the test requires, that "where the record evidence is sufficient, the district court may also measure the defendant's conduct against that of other participants in the criminal scheme attributed to the defendant" Id.  In analyzing the various roles in the drug courier context, the court set forth several relevant factors that a district court may consider in its analysis, which include but are not limited to "the amount of drugs, the fair market value of drugs, amount of money to be paid to the courier, equity interest in the drugs, role in planning the criminal scheme, and role in the distribution." Id. at 945.

Applying the first prong to the case at bar, Mr. Campos Tenorio is being held accountable for the entire amount of cocaine transported; therefore, his relevant conduct is identical to his actual conduct.  With respect to the second prong of the analysis, Mr. Campos Tenorio had absolutely no equity interest in the cocaine, and he was paid only a tiny fraction of the value of that cocaine.  He had no role whatsoever in the planning of the criminal scheme nor the eventual distribution of the cocaine.  Similarly, Mr. Campos Tenorio did not recruit any other participants, he had no knowledge of the scope of the broader conspiracy, and he was under the supervision of other members of the conspiracy. Consequently, Mr. Campos Tenorio is less culpable than the seller and buyer of the cocaine, the persons that organized the shipment of the cocaine, and the captain of the vessel.

Therefore, the below signed Counsel argues that Mr. Campos Tenorio should receive a two level reduction for minor role. Given the mandatory minimum in this case is 120 months, if the Court grants this two level adjustment that will result in a sentence of 120 months.

**C.** **The Need for the Sentence Imposed to Provide Just Punishment for the Offense**

The United States Coast Guard took Mr. Campos Tenorio into custody on September 27, 2015.  However, it was not until November 20, 2015 that Mr. Campos Tenorio had his initial appearance and arraignment in the Middle District of Florida.  During that nearly two-month interim, Mr. Campos Tenorio and the other detainees were chained on the deck of Coast Guard cutters.  Attorney Edward Panzica, who represented defendant Lorenzo Yonal Lemus-Mayen in this case, aptly summarized the suffering of the detainees in his sentencing memorandum:

> The prisoners were kept on the deck of the various vessels, chained to one another, and not allowed shelter below the decks. During their captivity the only shelter provided to the captives was a small tarp, which did provide occasional shade from the sun, but proved ineffective as any protection from the rain, which was constant; or the night chill, which became more pronounced as September turned into November. The prisoners were not fed the same rations as their captors, but were given some canned fruit salad and some occasional rice and beans. They did have plenty of water. Occasionally, one of the prisoners would request some more food, or offer a complaint about a sickness or sunburn. In response, they were encouraged to drink more water. Some of the prisoners became quite ill during the passage, which could prove to be unpleasant to those who were shackled to them. They did not have a latrine available for use, but were provided with a five gallon plastic buckets. They were not issued private buckets, but were required to share.[44]

As this Court considers the need for the sentence imposed to provide just punishment for the offense, it should consider the austere conditions that Mr. Campos Tenorio endured during his Coast Guard captivity, and grant a downward variance at sentencing.

---

[44] Doc. 119, page 5-6

**D. The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct**

Mr. Campos Tenorio is not a danger to reoffend. He is a simple, poor mariner who was seduced by the temptation of financial security. Mr. Campos Tenorio has no prior criminal history.[45] The United States Sentencing Commission has noted that first time offenders such as Mr. Campos Tenorio are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend.[46]

Mr. Campos Tenorio is well aware that when he agreed participate in this smuggling venture that he made the biggest mistake in his life. The results of that decision have been disastrous for him; he has been plucked from his native country, stripped of all that is familiar to him, and separated indefinitely from his family.

Perhaps most stinging to Mr. Campos Tenorio, he has lost the ability to support his children both financially and emotionally. Given the great privation he experienced as a child, Mr. Campos Tenorio knows the hardship his youngest child in particular is likely to endure in the coming years.[47]

When the Bureau of Prisons does eventually release Mr. Campos Tenorio, he will undoubtedly steer clear of any contact with drug shipments for the remainder of his life.

---

[45] PSR, page 6
[46] *Recidivism and the First Offender*, United States Sentencing Commission, May 2004
[47] Studies in the United States have shown that among children of incarcerated fathers, there are higher rates of homelessness, poor developmental outcomes, and greater family instability. *See*: When A Parent Goes To Prison, A Child Also Pays A Price; National Public Radio, June 8, 2014;

**IV.    <u>Conclusion</u>**

The Defense respectfully requests this Court take all the forgoing factors into consideration when it imposes a sentence that is "sufficient but not greater than necessary to comply with" the goals of sentencing set forth in 18 U.S.C. § 3553(a).  It is Defense Counsel's position that for all the reasons cited above the Honorable Court should sentence Mr. Campos Tenorio to the minimum mandatory sentence, 120 months.

## Certificate of Service

I HEREBY CERTIFY that on July 16, 2015, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Mr. Pat Scruggs, AUSA
Office of the United States Attorney
400 North Tampa Street, Suite 3200
Tampa. FL 33602

/s/ *David C. Hardy*
David C. Hardy, Attorney at Law
Florida Bar #689661
1710 N. 19th Street, Suite 215
Tampa, Florida 33605
Tel: (813) 990-9547
dch@thehardylawfirm.com